Slip Op. 06 - 114

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

_____

|  |  |  |
|---|---|---|
| DOUG SELIVANOFF, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, Judge** |
| | : | Court No. 05-00374 |
| UNITED STATES SEC'Y OF AGRICULTURE, | : | |
| | : | |
| Defendant. | : | |

_____

[Despite sympathy for the plight of the plaintiff Alaska salmon fisherman, whose income was apparently diminished due to foreign competition, the Court is compelled to accept the remand results of the Department of Agriculture denying the plaintiff's application for trade adjustment assistance benefits, which remand results are sustained.]

Decided: July 25, 2006

*Doug Selivanoff*, plaintiff *pro se*.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*); *Jeffrey Kahn*, Office of the General Counsel, U.S. Department of Agriculture, of counsel, for the defendant.

**OPINION AND ORDER**

Slip Op. 06-55 (April 18, 2006) remanded Doug Selivanoff's application for trade adjustment assistance cash benefits under 19 U.S.C. § 2401e to the U.S. Department of Agriculture, Foreign Agricultural Service (FAS) for consideration of whether storm damage to Mr. Selivanoff's fishing vessel, reduction of crew, and significant difference in the amount of depreciation, as compared with the pre-adjustment year figures, should be considered extraordinary items and therefore aberrant to a proper determination of Mr. Selivanoff's "net fishing income" for the claim year. *Cf.* 19 U.S.C.

§ 2401e(a)(1)(C). Mr. Selivanoff did not offer additional new information to FAS upon remand. Rather, he restated his argument that

> it would seem that legally the issue is to use a simple analysis of one line item to determine net income or to use a broader analysis to determine the actual impact of imported salmon on me the Fisherman.
>
> As you well know, life is complex and looking at just one factor would hardly represent a true reality. Judge Musgrave opened the door to expand the determination from a line item to a more accurate perspective of which I have actually lived through. On page 6 of the Judge[']s Opinion and Order there is an appeal by myself for you to look at the bigger picture. "In 2003 we worked harder, caught more fish but made less money than in 2001," multiple factors were at work.
>
> I would have not pursed this action of appealing the previous denial of benefits if I had figured that the original determination of denial was based in fairness and fact. I feel the determination was simplistic and did not represent reality on the fish grounds. I urge you to consider my whole argument and ultimately award me the $10,000.00 and allow the program to work as intended by Congress.

Letter of D. Selivanoff to FAS dated May 12, 2006, Administrative Remand Record 1.

On June 14, 2006, FAS again denied Mr. Selivanoff's application. *Reconsideration Upon Remand of the Application of Doug Selivanoff* (FAS, June 14, 2006) ("*Reconsideration*"). In accordance with the Court's order, the FAS considered whether Mr. Selivanoff's claims involved extraordinary income or expense items:

> In . . . 2003, [Mr. Selivanoff] incurred $6,890 in repairs and maintenance, which he deducted on line 9 on his 2003 income tax return. Thus, in a year in which there was not a storm, he still incurred a significant amount, approximately a third, in expenses for repairs and maintenance. We find that a storm causing damage to a fishing vessel necessitating repairs would not meet the criteria as an extraordinary item under the definition. Such expenditures are clearly directly related to a fishing business and can be expected to occur in the foreseeable future.

In his complaint, which the Court quotes, [Mr. Selivanoff stated as follows:] "In 2003 I reduced my crew by one, I increase my workload by 25%. Grub and Insurance cost dropped in 2003 because of the reduction of crew. Increasing my profits but the workload increased." Mr. Selivanoff proferred no evidence of these statements; however, even assuming that this was the case, we find that they would not meet the criteria [of] an extraordinary item under the definition. Adjustments to the size of a boat's crew and resulting savings would be in the norm for a fishing business.

In his complaint, which the Court quotes, [Mr. Selivanoff stated as follows:] "By 2003 my boat had pretty much depreciated out. In 2001 my depreciation was $4,135.00 and in 2003 it was $812." We find that depreciation would not meet the criteria as an extraordinary item under the definition. Depreciation of assets is annual and ordinary in any business.

*Id. Cf. Financial Guidelines for Agricultural Producers* ("*Guidelines*") (FFSC, Dec. 1997) at 22.

This complies with the Court's order, but as part of its rationale for rejecting Mr. Selivanoff's application, FAS distinguished the *Guidelines* as applicable only to the disposition of capital assets and only with respect to those by farmers. *Reconsideration* at 1-2, referencing *Miller GAAP Guide* (Aspen Law & Bus., Jan 2002) at ch. 41, p. 1. To the extent this requires clarification, FAS's distinguishment overlooks that FFSC considered arguments for and against excluding extraordinary items from net farm income ("NFI"), not merely those related to capital gain or loss, that have support in the accounting community (*see infra*). FFSC ultimately sided with

[t]hose who argue for calculation of NFI before the inclusion of gains or losses on capital sales [because] *the critical use for the NFI number is to analyze the operating results of the business from "normal operations[ ]" and . . . this number would logically not include one-time capital gains or losses.* Further, since it is so commonly used for analysis purposes, it should be available directly from the earnings statement.
* * *
It is important to note that to be considered an extraordinary item, the transaction or event must meet both of the criteria. The accounting literature also provides examples and additional guidance in this area. Write-downs of receivables, intangible assets, or inventories and gains or losses from sale or

abandonment of property or equipment used in the business are not extraordinary items because they are usual in nature and may be expected to recur. The accounting literature also identifies three specific items that should be reported as extraordinary items even though they may not exactly meet the criteria specified above. The only one of those items applicable to farm statements would be gains or losses from extinguishment of debt.

*Guidelines* at 22 (italics added). Notwithstanding FAS's distinguishment, the impact of the rationale

of the foregoing speaks for itself. *Cf. Miller GAAP Guide: Level A* (CCH 2006) ("*GAAP Guide*"):

For many years, there were differences of opinion in the accounting profession as to what should be included in net income. Proponents of the *all-inclusive concept* (sometimes called "clean surplus") believed that all items affecting net increases in owners' equity, except dividends and capital transactions, should be included in computing net income. Alternatively, proponents of the *current operating performance concept* (sometimes called "dirty surplus") advocated limiting the determination of net income to normal, recurring items of profit and loss that relate only to the current period and recognizing other items directly in retained earnings. Differences between the two concepts are seen most clearly in the treatment of the following items:

* Unusual or infrequent items
* Extraordinary items
* Changes in accounting principles
* Discounted operations
* Prior period adjustments
* Certain items that are required by GAAP to be recognized directly in stockholders' equity rather than in net income

Current GAAP (primarily APB-9, APB30, FAS-16) require the presentation of income in a manner that generally is consistent with the all-inclusive concept. Net income includes all items of revenue, expense, gain, and loss during a reporting period, except for prior period adjustments, dividends, and capital transactions, and a limited number of items that are required to be recognized directly in equity. Examples of items treated in this manner are certain foreign currency adjustments and certain changes in the value of debt and equity investments.

The FASB first introduced the term "comprehensive income" in its conceptual framework, CON-3 (Elements of Financial Statements), which

> was replaced subsequently by CON-6 of the same title. According to CON-6, *comprehensive income* is the change in equity of a business enterprise from transactions, other events, and circumstances from nonowner sources during a period. It includes all changes in equity during a period except those resulting from investments by owners and distributions to owners. CON-5 (Recognition and Measurement in Financial Statements of Business Enterprises) concluded that comprehensive income and its components should be reported as part of a full set of financial statements for a period and that earnings (*i.e.* net income) was a more narrow measurement of performance and, therefore, was a part of comprehensive income. FAS-130 (Reporting Comprehensive Income) requires the presentation of comprehensive income and its components in the financial statements.

*GAAP Guide* at 41.02 (italics in original). Further, to conclude that the rationale of the *Guidelines* is relevant only to land-based agricultural operations is to ignore any similarities between farming and fishing operations, not to mention congressional intent to extend trade adjustment assistance for farmers to fishermen and the fact that benefits for either are conditioned upon loss of income from an "adversely affected agricultural commodity." *See* 19 U.S.C. § 2401e(a)(1).

Previously, the Court drew attention to the fact that the *Guidelines*, and now here the *GAAP Guide*, considers a concept of "net income" (whether defined as net profit or loss or otherwise–*see* 7 C.F.R. § 1580.102) that excludes extraordinary and other items depending upon the perspective sought. *Cf.* Slip Op. 06-55 at 9 ("what is a 'normal' year [of net fishing income]?"). Given the tautology inherent in "net fishing income means net profit or loss,"[1] the Court was unclear as to FAS's perspective on the matter, although it was and is clear that FAS must make a determination in a particular instance with the "utmost regard" for the interests of applicants such as Mr. Selivanoff. *See, e.g.*, *Trinh v. United States Secretary of Agriculture*, 395 F.Supp.2d 1259 (CIT 2005). It was therefore appropriate to remand the matter for reconsideration.

---

[1] *See* 7 C.F.R. § 1580.102; *see also* Slip Op. 06-55 at 11.

FAS has again reached a negative decision upon reconsideration, and its filing implies its perspective that "net fishing income" is to be equated with the GAAP all-inclusive concept of net income. *Cf. Reconsideration* at 1 ("GAAP requires that net income include extraordinary items") (citation omitted). Whether or not that is in accordance with congressional intent, Mr. Selivanoff has elected not to submit comments thereon to the Court and has therefore failed to argue persuasively or demonstrate that the repairs/maintenance to his boat, the reduction of crew, and/or the difference in depreciation from year to year were not extraordinary items, that FAS's conclusions are unreasonable, or that his net fishing income for the claim year 2003 was less than his net fishing income for the pre-adjustment year figure for 2001. Accordingly, FAS's remand results are conclusive upon this Court. *See* 19 U.S.C. § 2395(b). There may indeed be a "more accurate perspective" of what Mr. Selivanoff actually lived through, but the Court can neither deduce it from the evidence and arguments presented for consideration nor speculate as to its legal impact on FAS's determination, in contravention of section 2395(b).

Judgment will enter accordingly.

    /s/ R. Kenton Musgrave      
R. KENTON MUSGRAVE, JUDGE

Dated: July 25, 2006
      New York, New York